IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| Vanity Fair Brands, LP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 26-01041 |
| | ) | |
| U.S. CUSTOMS AND BORDER PROTECTION; | ) | |
| RODNEY S. SCOTT, in his official capacity as | ) | |
| Commissioner of U.S. Customs and Border | ) | |
| Protection; and the United States of America, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

1. Beginning in February 2025, through a series of Executive Orders, President Trump invoked the International Emergency Economic Powers Act ("IEEPA") as authority to impose new and substantial tariffs ("IEEPA Tariffs") on goods imported from almost every foreign country, including countries from which Plaintiff obtains its imports.

2. Plaintiff, Vanity Fair Brands, LP ("Plaintiff"), is an importer of merchandise into the U.S. subject to the IEEPA Tariffs.

3. Plaintiff has paid estimated duties pursuant to the IEEPA Tariffs ("IEEPA Duties") on goods that it has imported and is required to continue to deposit IEEPA Duties on imported goods so long as the IEEPA Tariffs are in effect.

4. These IEEPA Duty payments become final and binding upon the liquidation of the associated customs entries, unless this court rules otherwise.

5. IEEPA does not authorize the president to impose the IEEPA Tariffs. *See V.O.S. Selections, Inc. v. Trump*, 772. F.Supp. 3d (Ct. Int'l Trade 2025), *aff'd*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

6. Defendants continued to collect IEEPA Duties.

7. Through this action, Plaintiff asks the Court to hold what it held on May 28, 2025, and what the Federal Circuit held on August 29, 2025, in *V.O.S. Selections*: that the IEEPA Duties exceeded the President's authority under IEEPA and that the IEEPA Duties and the underlying executive orders that directed them are unlawful.

8. The Supreme Court heard oral argument in *V.O.S. Selections* and a companion case from the U.S. District Court for the District of Columbia[1] on November 5, 2025, and is expected to rule in the near future.

9. This separate action is necessary, however, because even if the IEEPA Tariffs and their underlying Executive Orders are held unlawful by the Supreme Court, importers, including Plaintiff, have paid IEEPA Duties and are not guaranteed a refund for those unlawfully collected tariffs in the absence of their own judgment and judicial relief.

10. Accordingly, for itself, Plaintiff seeks (i) a declaration that the IEEPA Duties are unlawful; (ii) an injunction preventing Defendants from imposing further tariffs under the Executive Orders challenged in this lawsuit; and (iii) full refund from Defendants of all IEEPA Duties Plaintiff has already paid to the United States as a result of the Executive Orders challenged in this lawsuit, as well as those it will continue to pay.

**PARTIES**

11. Plaintiff, Vanity Fair Brands, LP, is a U.S. Company, located in Kentucky and organized in Delaware.

12. Defendant U.S. Customs and Border Protection ("CBP") is an agency of the U.S. Department of Homeland Security headquartered in Washington, D.C. CBP is responsible for border security and enforcement of customs laws, including the collection of tariffs, duties, taxes, and fees on goods imported into the United States. CBP collected payments made by Plaintiff of IEEPA Duties.

13. Defendant Rodney S. Scott is the Commissioner of CBP and is sued in his official capacity.

---

[1] *Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025).

14. Defendant United States of America received the disputed IEEPA Duties and is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

15. Defendants are referred to collectively in this complaint as "CBP" or "Defendants."

## JURISDICTION AND STANDING

16. The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1581(i) and 28 U.S.C. § 2631(i). *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1334 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025). The Court has subject matter jurisdiction under 28 U.S.C. § 1581 because this action is commenced against an officer of the United States and arises out of an executive order providing for tariffs. 28 U.S.C. § 1581(i)(1)(B); *see Silfab Solar, Inc. v. United States*, 296 F. Supp. 3d 1296, 1299 (Ct Int'l Trade 2018). CBP has no authority to make decisions regarding the legality or constitutionality of the Executive Orders at issue. Without protestable decisions being made by CBP under 19 U.S. Code § 1514, no protest challenge is available under 28 U.S.C. § 1581(a). Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 1581(i).

17. The Court has the same powers as a United States District Court at law, in equity, and as conferred by statute. 28 U.S.C. § 1585. Under 28 U.S.C. § 1581, this Court may enter a money judgment against the United States and order any other appropriate civil relief, including declaratory judgments, injunctions, orders of remand, and writs of mandamus or prohibition. 28 U.S.C. §§ 2643(a)(1), (c)(1).

18. Plaintiff has standing to bring this lawsuit as the importer of record for goods imported into the United States from countries subject to the unlawful IEEPA Tariffs as implemented and collected by CBP. It is "adversely affected or aggrieved by agency action" within the meaning of the Administrative Procedures Act because, as a result of the Executive Orders challenged by this lawsuit, Plaintiff has paid IEEPA Duties to the United States and thus has suffered injury caused by those unlawful Executive Orders. 5 U.S.C. § 702; 28 U.S.C. § 2631(i). The injury is ongoing as Plaintiff continues to pay IEEPA Duties.

19. Declaratory and injunctive relief from this Court would redress those injuries. Plaintiff faces imminent and irreparable harm because entries for which it paid IEEPA Duties are anticipated to liquidate imminently, and Plaintiff faces uncertainty as to whether Defendants will issue refunds of the IEEPA Duties as to its liquidated entries, notwithstanding the Defendants' statements in other actions before this Court. *See AGS Company Automotive Solutions v. U.S. Customs and Border Protection, et al.* Consol. Court No. 25-00255, Slip Op. 25-154 (December 15, 2025).

20. A plaintiff must commence an action under 28 U.S.C. § 1581(i)(1)(B) "within two years after the cause of action first accrues." 28 U.S.C. § 2636(i). The Executive Orders that resulted in the collection of IEEPA Duties were published in the Federal Register on or after February 1, 2025. The instant action is filed within two years of the date that these Orders were issued and published, and also within two years in which Plaintiff first paid these IEEPA Duties.

## GENERAL PLEADINGS

**I.    President Trump Ordered a Series of Tariffs, Invoking IEEPA for His Authority.**

   **A.    The IEEPA Duties**

21. On February 1, 2025, President Trump issued three Executive Orders imposing tariffs on imports from Canada, Mexico, and China. Each Executive Order was premised on IEEPA authorizing the tariffs, and claimed justification under IEEPA because of a purported national emergency.

22. Executive Order 14194, *Imposing Duties to Address the Situation at Our Southern Border*,[2] imposed an additional 25% tariff on the import of goods from Mexico. The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Mexico to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." *Id.*

---

[2] Exec. Order No. 14194, *Imposing Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 9177 (Feb. 7, 2025).

23. Executive Order 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, imposed an additional 25% tariff on the import of goods from Canada, subject to certain exceptions.[3] The President also claimed emergency powers based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of Canada to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and illicit drugs." *Id.*

24. Finally, Executive Order 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, imposed an additional 10 percent tariff on the import of goods from China. This Order declared an emergency due to the "sustained influx of synthetic opioids" and that "[m]any PRC-based chemical companies also go to great lengths to evade law enforcement and hide illicit substances in the flow of legitimate commerce."[4] The President's claim of emergency powers was based on "the grave threat to the United States posed by the influx of illegal aliens and illicit drugs into the United States" and "the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs." *Id.*

25. Four days later, on February 5, 2025, President Trump issued Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, addressing duty-free *de minimis* treatment under 19 U.S.C. § 1321 and the collection of IEEPA Duties.[5]

26. On March 3, 2025, Executive Order 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, raised the incremental tariffs

---

[3] Exec. Order No. 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9113 (Feb. 7, 2025).
[4] Exec. Order No. 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, Fed. Reg. 11463 (Mar. 7, 2025).
[5] Exec. Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277 (Feb. 5, 2025).

on imports from China to 20%, justifying this increase by claiming that "the PRC has not taken adequate steps to alleviate the illicit drug crisis."[6]

27. On April 2, 2025, citing trade deficits with the United States' trading partners as its own national emergency, the President issued Executive Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*.[7] Executive Order 14257 asserts that structural imbalances in the global trading system, including "U.S. trading partners' economic policies… suppress domestic wages and consumption, as indicated by large and persistent annual U.S. good trade deficits." *Id.* This Executive Order imposed a 10 percent baseline tariff on nearly all imports to the United States, effective April 5, 2025, and additional reciprocal tariffs on 57 countries, effective April 9. *Id.* at Annex 1. These higher country-specific tariffs ranged from 11% to 50%. *Id.*

28. On April 8, 2025, the President issued Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, responding to retaliatory tariffs from China by raising the reciprocal tariff rate by 50 percentage points, from 34% to 84%.[8]

29. The next day, on April 9, 2025, the President issued Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, suspending the higher country-specific tariffs on all countries except for China, and once again raising the reciprocal tariff rate on China from 84% to 125%.[9] The additional 20% opioid trafficking tariff remained in place, resulting in a minimum 145% IEEPA tariff on most imports from China.

---

[6] Exec. Order 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11463 (Mar. 3, 2025).
[7] Exec. Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041 (Apr. 2, 2025).
[8] Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports from the People's Republic of China*, 90 Fed. Reg. 15509 (Apr. 8, 2025).
[9] Exec. Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625 (Apr. 9, 2025).

30. In implementing these Executive Orders, the Defendant directed changes to the Harmonized Tariff Schedule of the United States, requiring that the goods subject to the challenged tariffs be entered under new additional tariff codes.

31. On April 14, 2025, several companies filed an action in this Court challenging the legality of these Executive Orders. *See V.O.S. Selections, et al. v. Donald J. Trump, et. al.,* No. 25-cv-00066 (Dkt. 2). As discussed below, this Court held the orders were unlawful and the Federal Circuit, sitting *en banc*, affirmed.

32. In the months since the *V.O.S. Selections* complaint was filed, the President has issued additional Executive Orders imposing additional tariffs and modifying others, repeatedly invoking IEEPA. As explained below, IEEPA does not authorize the President to impose any of these tariffs.

    B. **CBP's Implementation of the Unlawful IEEPA Tariffs**

33. CBP is charged with the assessment and collection of duties, including the IEEPA Duties. *See* 19 U.S.C. §§ 1500, 1502.

34. In 1988, Congress enacted the Omnibus Trade and Competitiveness Act of 1988, which adopted the new tariff nomenclature: the Harmonized Tariff System of the United States ("HTSUS"). Pub. L. No. 100-418, 102 Stat. 1107 (1988). CBP classifies merchandise imported into the United States according to the HTSUS, which sets out the tariff rates and statistical categories using a series of chapters, headings, and subheadings. 19 U.S.C. § 1202. The primary headings of the HTSUS describe broad categories of merchandise, while its subheadings provide a particularized division of the goods within each category. *Id.*

35. CBP's regulations govern the classification and appraisement of merchandise, consistent with the HTSUS. 19 C.F.R. § 152.11. ("Merchandise shall be classified in accordance with the Harmonized Tariff Schedule of the United States (19 U.S.C. § 1202) as interpreted by administrative and judicial rulings.")

36. The United States International Trade Commission publishes and maintains the HTSUS consistent with presidential orders. 19 U.S.C. §§ 1202, 3005, 3006; *see also Michael Simon*

*Design, Inc. v. United States*, 33 C.I.T. 1003, 10010, 637 F. Supp. 2d 1218, 1225 (2009) ("The authority to modify the HTSUS lies with the President"); *Maple Leaf Mktg., Inc. v. United States*, 528 F. Supp. 3d 1365, 1378-79 (Ct. Int'l Trade 2021).

37. When goods enter the United States, CBP is responsible for assessing and collecting all duties, tariffs, taxes, and fees on those goods, after confirming the HTSUS classification of the goods, according to the rates established by the HTSUS. 19 U.S.C. §§ 1202, 1500, 1502. CBP has effectuated the collection of IEEPA Duties, as communicated, through its Cargo Systems Messaging Service ("CSMS").

### C. Liquidation

38. "'Liquidation' means the final computation or ascertainment of duties on entries for consumption or drawback entries." 19 C.F.R. § 159.1.

39. Typically, when goods enter (*i.e.*, are imported into) the United States, the importer of record pays an estimate of the duties, taxes, and fees ("duty") owed on the entry based on its customs declaration, which asserts a value, origin, and HTSUS classification for the imported goods. *See* 19 U.S.C. § 1484. CBP then reviews the customs declaration and may inspect the goods.

40. CBP then fixes the final appraisement of merchandise by confirming the final value, classification, duty rate, and final amount of duty for the imported goods. *See* 19 U.S.C. § 1500.

41. Once the final amount of duty is determined by CBP, CBP liquidates the entry and notifies the importer of record as to whether they owe more money or are entitled to a refund. *See* 19 U.S.C. § 1504(b).

42. Liquidation of an entry must occur within one year, unless such liquidation is extended. *See* 19 U.S.C. § 1504(a). Typically, liquidation occurs automatically by operation of law. *See* 19 C.F.R. § 159.11. In practice, CBP normally liquidates entries 314 days after the date of entry of the goods and will usually post a notice on its website.

43. CBP has discretion to extend the deadline for liquidation for up to one year pursuant to an importer's request and a showing of good cause. *See* 19 U.S.C. § 1504 (b)(2); 19 C.F.R. § 159.12(a)(1)(ii).

44. Once liquidation has occurred, and if the liquidation is protestable, an importer of record has 180 days to file a protest contesting the liquidation, asking CBP to "reliquidate" the entry. *See* 19 U.S.C. § 1514. CBP can also voluntarily reliquidate entries within 90 days of the liquidation. 19 US.C. § 1501. However, not all liquidations are protestable: where CBP acts in a ministerial capacity (*i.e*., without discretion) in imposing a duty, the entry's liquidation cannot be protested. *Id.; see also Rimco Inc. v. United States*, 98 F.4th 1046, 1053 (Fed. Cir. 2024). A protestable liquidation under § 1514(a) requires CBP to have engaged in some sort of decision-making process.

45. This Court possesses the equitable authority to suspend liquidation. *E.g., In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1365-66 (Ct. Int'l Trade 2021).

46. This Court and the Federal Circuit have cautioned that an importer may lack the legal right to recover refunds of duties for entries that have liquidated, even where the underlying legality of a tariff is later found to be unlawful, and that the CBP decision to liquidate entries with the collection of the IEEPA Duties may not be a protestable event. *See In re Section 301 Cases*, 524 F. Supp. 3d at 1365-66; *Target Corp. v. United States*, 134 F.4th 1307, 1316 (Fed. Cir. 2025).

47. Nonetheless, a decision by this Court in a nearly identical action cites the Defendants as stating that they "will not oppose or object to the [c]ourt's authority to order reliquidation" and that "[s]uch reliquidation would result in a refund of all duties determined to be unlawfully assessed, with interest." This Court held that Defendants would be judicially estopped from taking a position inconsistent with this statement, concluding that "the Government has taken the 'unequivocal position' that 'liquidation will not affect the availability of refunds after a final decision' in V.O.S." *See AGS Company Automotive Solutions v. U.S. Customs and Border Protection, et al.* Consol. Court No. 25-00255, Slip Op. 25-154 (December 15, 2025).

## II.  IEEPA Does Not Authorize Tariffs

48. The Challenged Executive Orders cite IEEPA, 50 U.S.C. § 1701 *et seq.*, the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*, section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483, and 3 U.S.C. § 301 for their authority to impose tariffs.

49. None of these statutes authorizes the President to impose tariffs. Further, it is IEEPA alone that the President and CBP lean on to impose the IEEPA Tariffs and collect the challenged IEEPA Duties. IEEPA does not authorize the tariffs that the Challenged Executive Orders seek to impose.

50. IEEPA grants the President certain powers, but they "may only be exercised to deal with an unusual and extraordinary threat with respect to which a national emergency has been declared for purposes of this chapter and may not be exercised for any other purpose." 50 U.S.C. § 1701(b).

51. Those powers include the ability to "investigate, regulate, or prohibit" certain transactions in foreign exchange, payments made through banks involving foreign countries or nationals, or imports of "currency or securities." 50 U.S.C. § 1702 (a)(1)(A).

52. Under IEEPA, the President may also control, block, or prohibit the movement or importation of funds or property in which "any foreign country" or foreign national has an "interest" in, and which is also subject to U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(B).

53. Finally, and only when the United States is engaged in "armed hostilities" or has been attacked by a foreign country, the President may "confiscate" property of such a foreign person or country that is also subject to U.S. jurisdiction. 50 U.S.C. § 1702(a)(1)(C).

54. The text of IEEPA does not use the word "tariff" or any term of equivalent meaning.

55. IEEPA was first enacted in 1977 and has been amended several times, but it has never been amended to authorize, nor been used by any other President to impose, tariffs.

### A. The U.S. Constitution Vests the Power to Impose Tariffs in Congress, not the President.

56. The United States Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States." U.S. Const. art. I, § 1.

57. The United States Constitution also provides that "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises…", and [t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cl. 3. It has always been understood that tariffs fall within these clauses.

58. To the extent that it is ever permissible under the United States Constitution for Congress to delegate any part of the powers vested in it by the Constitution to the President, it must do so, at a minimum, by providing an intelligible principle to direct and cabin the President's authority. *See Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 145 S. Ct. 2482, 222 L. Ed. 2d 800 (2025). In the case of the President's authority under IEEPA, Congress failed to provide an intelligible principle to direct and cabin the President's authority. This is evident by the chaotic manner by which these IEEPA Duties have been threatened, imposed, modified, suspended, and re-imposed.

59. Reading IEEPA as granting tariff authority to the President would be self-defeating because it would also require striking down IEEPA as unconstitutional under the non-delegation doctrine for lack of any intelligible principle.

60. Moreover, "[c]ourts expect Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political significance." *W. Virginia v. EPA*, 597 U.S. 697, 716 (2022) (*quoting Util. Air Regul. Grp. v. EPA*, 573 U. S. 302, 324 (2014)). When Congress has not clearly spoken, courts are directed to find that matters "of vast economic and political significance" are beyond the power of the President. *Biden v. Nebraska*, 600 U.S. 477, 505–06 (2023).

61. By any objective measure, the Challenged Executive Orders are of "vast economic and political significance." Because IEEPA does not clearly authorize the President to set tariffs, as the statute fails to mention the words "tariff" or "duty" and resides outside of the title of the U.S. Code

containing Congress's trade laws (Title 19), the Challenged Executive Orders cannot stand and the Defendants are not authorized to implement and collect these IEEPA Duties.

### B. Courts, Including This Court, Have Agreed the IEEPA Duties are Unlawful.

62. On May 28, 2025, a three-judge panel of this Court granted summary judgment to the plaintiffs in *V.O.S. Selections* and permanently enjoined the government from enforcing the IEEPA Duties at issue in that case. That decision was appealed to the Court of Appeals for the Federal Circuit.

63. The Federal Circuit stayed this Court's decision and injunction and ordered an expedited briefing schedule and hearing.

64. Sitting *en banc*, the Federal Circuit issued its decision on August 29, 2025, affirming this Court's decision that the IEEPA Duties are unlawful. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, No. 25-250, 2025 WL 2601020 (U.S. Sept. 9, 2025).

65. In a separate lawsuit filed by a separate group of importers, the U.S. District Court for the District of Columbia held that IEEPA does not authorize tariffs of any sort. *See Learning Res., Inc. v. Trump*, 784 F. Supp. 3d 209 (D.D.C. 2025), *cert. granted before judgment*, No. 24-1287, 2025 WL 2601021 (U.S. Sept. 9, 2025). That decision was appealed to the Court of Appeals for the D.C. Circuit, but before the D.C. Circuit held argument, the United States Supreme Court granted certiorari in both *V.O.S. Selections* and *Learning Resources*. The cases were consolidated, with argument on November 5, 2025.

66. Throughout, CBP continued to collect the IEEPA Duties at the time of entry.

### III. Plaintiff Has Paid Preliminary IEEPA Duties.

67. As of the date of this complaint, Plaintiff has paid estimated IEEPA Duties imposed by the Challenged Executive Orders.

68. Plaintiff's imports subject to IEEPA Duties entered the United States from foreign countries, under new HTSUS subheadings enacted to implement the IEEPA Duties.

69. Plaintiff has paid estimated IEEPA Duties on a continuous basis, including after this Court and the Federal Circuit issued its decision.

70. The entries for which Plaintiff has paid estimated IEEPA Duties are scheduled to be finalized through the liquidation process and will liquidate in the near future.

71. Based on Plaintiff's knowledge and belief, CBP has advised importers that it will not be extending liquidation for entries subject to IEEPA Duties.

## STATEMENT OF CLAIMS

### COUNT 1

**THE CHALLENGED EXECUTIVE ORDERS ARE *ULTRA VIRES* UNDER *V.O.S. SELECTIONS***

72. Plaintiff incorporates paragraphs 1-71 above by reference.

73. The Court of International Trade in *V.O.S. Selections, Inc. v. Donald J. Trump*, 772 F. Supp. 3d. 1350, 1383 (Ct. Int'l Trade 2025), aff'd, 149 F.4th 1312 (Fed. Cir. 2025), held that the President exceeded his authority under IEEPA, 50 U.S.C. § 1701 et seq., when he imposed tariffs on imported goods.

74. As the *V.O.S. Selections* Court explained, IEEPA authorizes the President only to "investigate, regulate, or prohibit" certain foreign transactions in times of national emergency; it does not authorize the imposition of tariffs or duties on imports, and neither the text of IEEPA nor its legislative history contains any clear delegation to the President to set tariff rates.

75. The Federal Circuit affirmed this Court's decision, holding that Congress did not clearly delegate to the President the authority to impose the challenged IEEPA Duties.

76. The Challenged Executive Orders are the same as those struck down in *V.O.S. Selections*. They purport to impose tariffs and modify the HTSUS solely pursuant to IEEPA. For the reasons set forth by the Federal Circuit in *V.O.S. Selections*, the Challenged Executive Orders exceed the President's statutory authority and are therefore unlawful, *void ab initio*, and without effect as applied to Plaintiff.

77. Plaintiff respectfully requests that this Court follow the binding precedent of the Federal Circuit, declare the Challenged Executive Orders unlawful as to Plaintiff, enjoin CBP from enforcing

them as to Plaintiff, and order CBP to refund all IEEPA Duties collected from Plaintiff, with interest as provided by law.

## COUNT II

**ALTERNATIVE – THE CHALLENGED EXECUTIVE ORDERS ARE UNCONSTITUTIONAL**

78. Plaintiff incorporates paragraphs 1-77 above by reference.

79. In the alternative, if the Court were to construe IEEPA as authorizing tariffs, the IEEPA Executive Orders must nevertheless be held unlawful because IEEPA in that event would constitute an impermissible delegation of legislative power from Congress to the President.

80. The U.S. Constitution vests in Congress exclusively the power to "lay and collect … Duties". U.S. Const. art. I, § 8, cl. 1.

81. Under separation-of-powers principles and binding precedent of the U.S. Supreme Court, Congress cannot delegate its power to the President unless, at the very least, it provides an intelligible principle that directs and meaningfully constrains the President's exercise of that power. IEEPA does not do that.

82. Plaintiff therefore seeks a declaration that the Challenged Executive Orders are unconstitutional as to Plaintiff, and asks the Court to enjoin CBP and Defendants from enforcing them as to Plaintiff, and order CBP to refund all IEEPA Duties collected from Plaintiff, with interest as provided by law.

## COUNT III

**(DECLARATORY RELIEF, 28 U.S.C. § 2201)**

83. Plaintiff incorporates paragraphs 1-82 above by reference.

84. Federal courts have the power "to declare the rights and other legal relations of any interested party seeking such a declaration." 28 U.S.C. § 2201(a).

85. Plaintiff's claims present an actual controversy as to the President's authority under IEEPA, the constitutionality of IEEPA, and the authority of CBP to implement and collect the resulting tariffs.

86. Plaintiff is an importer of record and has suffered injury by having been required to pay IEEPA Duties as a result of the Challenged Executive Orders on goods it has imported into the United States.

87. This Court can exercise its equitable power to enter a declaratory judgment that the Challenged Executive Orders are unlawful for any of the above reasons, and that CBP lacks authority to implement and collect the resulting tariffs, as to Plaintiff.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that this Court:

a) declare that the President lacks authority under IEEPA to set tariffs;

b) declare that the Challenged Executive Orders are *ultra vires* and *void ab initio* with respect to Plaintiff;

c) declare that, with respect to Plaintiff, CBP lacks authority to implement and collect any tariffs set out in the HTSUS that are based on the Challenged Executive Orders;

d) with respect to Plaintiff, enjoin CBP from imposing and enforcing any tariffs set out in the HTSUS that are based on the Challenged Executive Orders;

e) order the United States to refund to Plaintiff the IEEPA Duties collected on those entries, with interest as provided by law; and

f) award Plaintiff its reasonable costs, including attorneys' fees, incurred in bringing this action;

g) grant such further relief as this Court deems proper.

                                          Respectfully submitted,

Dated: February 18, 2026        /s/ Robert A. Shapiro
                                          Robert A. Shapiro
                                          THOMPSON COBURN LLP
                                          1909 K Street, NW
                                          Suite 600
                                          Washington, DC  20006
                                          Tel: (202) 585-6926
                                          rshapiro@thompsoncoburn.com

                                          *Counsel for Plaintiff*